Receipt #067019

ORIGINAL

FILED
DEC 2 6 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GULF GROUP, INC.<br>Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-898 C |
| | ) | |
| THE UNITED STATES,<br>Defendant. | ) | |

COMPLAINT FOR EQUITABLE ADJUSTMENT AND BREACH OF CONTRACT

Gulf Group, Inc. alleges as its Complaint as follows:

1. This complaint is necessitated by the U.S. Army Corps of Engineers' ("COE") improper refusal following Hurricane Katrina to pay Gulf claims of $743,090 under DACW29-02-C-0016 ("Contract") to pay for damages resulting from (a) Type I and Type II differing site conditions and/or defective design specifications, b) variations in quantities exceeding the contractual limits, (c) directed performance of necessary hurricane flood protection, and (d) closeout costs incurred after a retroactive acceptance of contract work.

JURISDICTION

2. The Court has jurisdiction under the Contract Disputes Act, 41 U.S.C. §607.

PARTIES

3. Plaintiff, Gulf Group, Inc. is an experienced government construction contractor that has performed similar projects for the Corps of Engineers and other federal agencies over the past 19 years.

4. Defendant, United States, represents the U.S. Army Corps of Engineers ("COE"), New Orleans, Louisiana, the procuring activity that issued the solicitation and administered the Contract.

## FACTUAL BACKGROUND

A. Unusual Water Surges Require Continual Rip Rap Rework

5. The Contract at issue was awarded to Gulf on December 27, 2001 in the amount $4,920,687.50. There were approximately 48 changes to the contract, increasing the contract price by over $3 million and extending the period of performance until the Corps purported to declare the project "substantially complete" on November 7, 2005.

6. The contract was a fixed price, build-to-print contract for construction of bridges, pilings, approaches, roadways, utilities, bridge demolition, channel excavation, and flood protection improvements. The work was performed on the Outfall Canal Metairie Relief, Hammond Highway Complex, Orleans and Jefferson Parish, Louisiana which is near Lake Ponchartrain. The COE provided the drawings which were prepared by its engineers and which specified the design of the rip rap. The COE design for rip rap on the Jefferson Parrish side of the canal extended part way down the slope and indicated a flow rate of up to 6,650 cubic feet per second ("CFS"). Upon information and belief, the design did not make any provisions for water surges and/or turbulent conditions.

7. Gulf performed construction including dredging and rip-rap placement on the 17th Street Canal in accordance with the contract drawings.

8. During the performance period, there were two pumping stations discharging water from Lake Ponchartrain into the 17th Street Canal upstream from the construction work, Pumping Station No. 6 and Pumping Station No. I-10 (Interstate 10 at Academy Road).

9. Upon information and belief, both of these Pumping Stations were funded by the COE and approved prior to contract award.

10. The COE was aware that there would be irregular water surges from Pumping Station I-10 into the 17th Street Canal but allegedly chose not to disclose this fact in the solicitation because it already had disclosed the existence of Pumping Station No. 6. These pumping stations together are capable of pumping in excess of 11,000 CFS. Nothing in the contract indicated the possibility of this CFS level.

11. After Gulf began the rip rap placement, there were water surges from these pumping stations along the 17th Street Canal which on multiple occasions displaced the rip rap that Gulf had installed where indicated on the plans. These water surges came from individual and/or combined water being discharged from Pumping Stations Nos. 6 and No. I-10. Gulf was required Gulf to re-perform the rip rap work several times.

12. Gulf has performed rip rap work in the presence of pumping stations all over the Southeast United States and had never encountered water surges sufficient to displace rip rap it installed, as was repeatedly experienced in the 17th Street Canal.

13. The Contract advised that water surges from Pumping Station No. 6 were present and indicated that the contractor should coordinate with the Water and Safety Board for the safety of its personnel. The Contract provided no indication that the surges were other than at velocities normally to be expected.

14. Upon information and belief, the COE was or should have been aware of the expected velocity of the surges but did not disclose this knowledge in the solicitation or include protective measures in the specifications or design.

15. The erratic frequency and unusual strength of the water surges could not have been determined by a reasonable site inspection.

16. Initially, when the rip rap was displaced, Gulf believed that the rip rap had not been installed to grade. However, after reinstalling the rip rap several times, Gulf realized that the problem was being caused by water surges.

17. Upon realization of the cause, Gulf notified the Corps of the impact of water surges in periodic meetings between the parties. Gulf asked for technical direction on how to proceed and assistance in determining when water would be discharged. Gulf was told to contact the Sewerage & Water Board in order to determine the pumping schedule and was ordered to proceed with the work in accordance with the drawings.

18. Gulf attempted to contact the Sewerage & Water Board several times but received no response. After being told about the failure of the Board to respond, upon information and belief, the COE made no attempt to contact the Board to assist Gulf but continued to order Gulf to proceed with the work. As a result, Gulf had to continue to perform operate without knowing when the Pumping Stations would operate or their impact on the rip rap.

19. The frequency of the water surges at irregular intervals increased and continued to necessitate rip rap rework. Gulf continued to notify the COE of this problem during periodic meetings but the COE continuously refused to provide any other direction.

20. Upon information and belief, prior to contract award, these pumping stations had been designed, specified and/or approved by the COE. Their design proved defective. When combined with unusual conditions from Hurricane Katrina, the water surges created by these pumping stations led to the destruction of a greater than 100-foot wall near the site.

B. Hurricane Katrina Related Damages

21. On July 6, 2005, prior to Hurricane Katrina, the COE directed Gulf to maintain the "required preparedness" to perform temporary flood protection work:

> "... to maintain necessary/equipment and materials to close gaps in flood protection to minimum elevation of 11.5 feet (changed to elevation of 13.5 NVGD in modification) with sheet piling and/or sand bags within 24 notification of Contracting Officer." (emphasis added).

22. Gulf followed the COE's direction. To maintain the "required preparedness", Gulf kept the necessary equipment and emergency sheet piling on site.

23. By the afternoon of August 27, 2005, as Hurricane Katrina approached, Gulf had closed certain gaps. When it became apparent that Katrina would strike New Orleans, however, Gulf was unable to move its equipment to a safe location. The entire area was gridlocked. Government disaster officials had to come and go in helicopters.

24. When Hurricane Katrina struck, as a result of the COE's negligent design of the Lake Ponchartrain dam, and the COE's failure to direct Gulf to leave the area sooner, Gulf's equipment and sheet pilings were destroyed.

25. When Gulf requested payment for the equipment, the COE rejected this request claiming that Gulf had not completed its temporary flood protection work and somehow was at fault for not removing the equipment.

C. Gulf's Requests for Payment and Claims

26. On June 29, 2006, Gulf submitted a claim under the Variations in Estimated Quantities ("VEQ") clause based on underruns for various items.

27. On June 29, 2006, the COE offered Gulf $59,695.49 for settlement of the VEQ claims, treating Gulf's claims based on differing site conditions as VEQ claims.

28. On August 2, 2006, Gulf agreed to the COE's offer for $36,890.22 for underruns. Gulf also submitted a request for $219,087.96 for riprap and dredging costs resulting from differing site conditions, variation in quantities, hurricane preparation, and closeout costs.

D. The COE's Retroactive Contract Acceptance; Gulf's Claim is Filed

29. Following Hurricane Katrina, Gulf maintained its equipment on site waiting to resume performance for a period of 73 days.

30. In November 2005, the COE decided to delete the remaining work on the contract and considered the work performed as it stood 73 days before to be "substantially complete."

31. When Gulf requested payment for its closeout costs including the hurricane preparedness work, and the home office and equipment costs incurred while waiting for direction to resume performance, the COE refused to make payment.

32. On January 8, 2007, Gulf files a certified claim for an equitable adjustment in the amount of $743,090.57 for claims comprising (a) rip rap, (b) VEQ underruns, (c) hurricane preparation, and (d) closeout costs.

33. By a Contracting Officer decision dated July 27, 2007, the COE denied this and Gulf's other claims but stated it would issue a modification for payment of $59,695.49 supposedly covering the VEQ claim and conceded Gulf's entitlement to some undefined costs in preparing for the hurricane. This action followed.

COUNT I

DIFFERING SITE CONDITIONS, DEFECTIVE DESIGN AND BREACH

34. Gulf realleges the statements in paragraphs 1-33 as though set forth fully herein.

35. Under the Differing Site Conditions clause, FAR §52.236-2 (1984), the Government is liable for damages when:

(1) the conditions indicated in the contract differ materially from those actually encountered during performance;

(2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding;

(3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and

(4) the contractor was damaged as a result of the material variation between expected and encountered conditions.

36. In this case, Section 1100(25) of the Contract indicated the presence of water surges from one source, Pumping Station No. 6. The Contract also did not indicate that the water surges would be of materially different velocities from those indicated by the drawings or those normally encountered in similar construction work. Upon information and belief, the design was also defective in failing to make any provisions for water surges and/or turbulent conditions. While the Contract suggested that Gulf contact the Sewerage & Water Board in regard to the potential safety to workers performing construction, this was a normal warning when any water surge is present and provided no notice of this differing site condition.

37. Although the COE was aware that another Pumping Station, No. I-10 would be operating during contract performance, and upon information and belief, was aware of the unusually high individual and combined discharge rates, the COE chose not to notify Gulf of these facts, which were not and would not have been discovered from a reasonable site inspection.

38. Gulf performed the rip rap work in accordance with the drawings. Gulf has performed many contracts requiring the same type of rip rap work in the presence of pumping stations. Gulf has never encountered unusual water surges of the strength to displace installed rip rap.

39. In preparing its offer, based on the contract documents and its experience, Gulf reasonably did not include any additional costs for re-performance of rip rap work.

40. Gulf incurred substantial damages of $261,220.39 in re-installing rip rap that was repeatedly displaced by water surges. Gulf is entitled to this equitable adjustment of this amount under the Differing Site Conditions clause and/or under the Changes Clause as a result of the COE's defective design.

41. Further, when Gulf sought technical direction and COE assistance to attempt to mitigate the damages from water surges, the COE refused to provide technical assistance or direction and ordered Gulf to proceed with the work. This was a breach of the COE's duty of reasonable cooperation.

42. Finally, the COE breached the contract by failing to provide superior knowledge in its possession on the pumping stations, the timing of discharges of both stations, and the strength of water surges to be expected that was not reasonably available to Gulf.

43. Gulf is entitled to recover $261,220.39 for these differing site conditions and breaches of contract.

COUNT II

Equitable Adjustment under the Variations in Quantity Clause

44. Gulf realleges the statements in paragraphs 1-43 as though set forth fully herein.

45. Under the Contract's VEQ clause, FAR §52.211-18 (1984), Gulf is entitled is an equitable adjustment if the estimated quantities ordered were less than 85% of the estimate.

46. The quantities ordered by the COE underran various estimated quantities. Following submission of its claim, Gulf agreed to accept $36,890.22 as payment for certain underruns but would not accept the payment offered for differing site condition damages. The COE refused to make this or any partial payment. The alleged modification that will be issued as a settlement was not and will not be accepted by Gulf as settlement of the differing site conditions claim.

47. Gulf is entitled to an equitable adjustment under the VEQ clause for of $36,890.22 which is exclusive of its differing site condition claim.

COUNT III

HURRICANE PREPAREDNESS

48. Gulf realleges the statements in paragraphs 1-47 as though set forth fully herein.

49. Contract Section 02413 gave the COR the right to require Gulf to provide temporary flood control protection.

50. On July 6, 2005, pursuant to this clause, the COE directed Gulf to be prepared to provide temporary flood control which included maintaining the necessary equipment and materials on site to close gaps in flood protection.

51. Gulf followed the COE's direction. However, on August 27, 2005, when it became clear that Hurricane Katrina would strike New Orleans, Gulf could not remove its equipment or materials.

52. As a result of the COE's negligent design of the Lake Ponchartrain dam and levees, and the failure of the COE to warn Gulf sooner to vacate the area, when Hurricane Katrina struck, Gulf's equipment and sheet pilings were destroyed.

53. The COE's defense that Gulf could have removed its equipment from the site is capricious. Disaster officials had to move through New Orleans by helicopter at that time. The Mayor of New Orleans' mandatory evacuation notice is irrelevant. The equipment the COE required at the site could not possibly have been moved.

54. The COE's direction required Gulf to maintain a state of "preparedness." However, the COE failed to reasonably cooperate and did not direct Gulf to stop work in enough time to avoid damage to its equipment.

55. Under Section 1.2.2 of the Contract, Gulf is entitled to an equitable adjustment under the Changes clause for $225,892 for its actual cost of "maintaining" that state, inclusive of the value of the lost equipment and materials and for the preparedness work performed in closing gaps, plus Gulf's standard overhead and profit.

COUNT IV

CLOSEOUT COSTS

56. Gulf realleges the statements in paragraphs 1-55 as though set forth fully herein.

57. Following Hurricane Katrina, Gulf maintained its equipment, home office and materials on site in order to be prepared to resume work. In addition, Gulf continued to incur the rental cost of the equipment that had been destroyed. As a result, home office personnel, equipment not destroyed, and materials could not be used on other Gulf work.

58. On November 7, 2005, the COE retroactively declared the contract substantially complete as of August 29, 2005. On this basis, the COE refused to pay any of the above closeout costs.

59. The COE required Gulf to be prepared to continue performance for 73 days, during which period, Gulf incurred home office and equipment standby costs of $219,087.96 while waiting for COE direction.

60. The COE cannot both require Gulf to remain prepared to perform and incur costs and thereafter, retroactively change the termination date as though Gulf had the ability to mitigate those damages 73 days earlier.

61. While the COE has stated they intend to pay some amount for hurricane preparedness, they have not done so. Gulf is entitled to closeout costs and hurricane preparedness damages of $219,087.96.

**WHEREFORE**, Gulf respectfully requests that that the Court issue an order requiring the COE to pay damages in the amount of $743,090, plus applicable interest, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

Michael A. Gordon
HOLMES & GORDON
17 West Jefferson Street, Suite 202
Rockville, Maryland 20850
(301) 340-1251 (telephone)
(301) 340-1253 (facsimile)
Counsel for U/M

Date: December 26, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GULF GROUP, INC.<br>Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| THE UNITED STATES,<br>Defendant. | ) | |

BANNUM, INC'S CORPORATE DISCLOSURE STATEMENT

Pursuant to RCFC 7.1, Plaintiff, Gulf Group, Inc., ("Gulf"), through its undersigned counsel of record, submits this corporate disclosure statement. Gulf has no parent corporation and no publicly-held corporation holding 10% or more of Gulf's stock.

Respectfully submitted,

Michael A. Gordon
Counsel of Record for Gulf Group, Inc.
HOLMES & GORDON
17 West Jefferson Street
Rockville, Maryland 20850
(301) 340-1251
(301) 340-1253 (facsimile)

OF COUNSEL:
Fran Baskin, Esquire
HOLMES & GORDON
17 West Jefferson Street
Rockville, Maryland 20850
(301) 340-1251
(301) 340-1253 (facsimile)